CALIFORNIA FRUIT WRAPPING MILLS (INC.) *v.* UNITED STATES (No. 3468) [1]

United States Court of Customs and Patent Appeals, February 29, 1932

*Lawrence A. Harper* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*Daniel P. McDonald*, special attorney, of counsel), for the United States.

[1] T. D. 45513.

[Oral argument February 12, 1932, by Mr. McDonald; submitted on brief by appellant]

Before Graham, Presiding Judge, and Bland, Hatfield, Garrett, and Lenroot, Associate Judges

Lenroot, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (one member dissenting) holding certain Fourdrinier-wire screens, entered at the port of Los Angeles, dutiable at 30 per centum ad valorem under paragraph 372 of the Tariff Act of 1922, as "machine parts, not specially provided for," and overruling the protests of appellant claiming classification at 20 per centum ad valorem under paragraph 356 of said act. Two entries are involved, and protests against the collector's classification were duly filed.

The competing provisions of said paragraphs of the Tariff Act of 1922 read as follows:

Par. 372. * * *; all other machines or parts thereof, finished or unfinished, not specially provided for, 30 per centum ad valorem; * * *.

Par. 356. Planing-machine knives, tannery and leather knives, tobacco knives, paper and pulp mill knives, roll bars, bed plates, and all other stock-treating parts for pulp and paper machinery, shear blades, circular cloth cutters, circular cork cutters, circular cigarette cutters, meat-slicing cutters, and all other cutting knives and blades used in power or hand machines, 20 per centum ad valorem.

The issue is whether the wire screens involved are "stock-treating parts for pulp and paper machinery," provided for in said paragraph 356, as claimed by appellant, or are parts of machines dutiable at 30 per centum ad valorem under paragraph 372, as classified by the collector.

It is conceded that the screens here involved are indispensable parts of paper machines.

One witness testified on behalf of appellant, and the Government offered no testimony.

From the testimony introduced, it appears that the sole function performed by said screens, which are endless and travel on rollers, is to carry, in film form, the prepared paper stock from its receptable, the so-called head box, to the felt, which in turn passes it between the rollers of the paper machine for several squeezings. When deposited upon the screen, the stock is about 99 per centum water, and as the film passes over said screens, a distance of approximately 60 feet, much of the water is naturally drained off before the film reaches the rollers for squeezing to release more water.

Appellant contended in the court below, and contends here, that the wire screens perform a treating process of the stock in that much of the water is drained through the screen while the stock is carried forward by it.

In its decision the lower court said—

As we view the record, the stock when it reaches the head box has already been fully treated and finished as stock, and all subsequent manipulations thereof properly pertain to its manufacture or conversion into something other than stock. It is ready to be made into either pulp board or into paper, and the elimination therefrom of the water is merely the first step in its manufacture into the new product. We do not believe that the elimination of water therefrom can in any sense be considered a further treatment of the stock itself.

Judgment was entered accordingly overruling the protests, and from such judgment this appeal is taken.

The court below correctly observed that the contention of appellant, carried to its logical conclusion, would mean that all parts of the paper-manufacturing machines which in any way treat or manipulate the material, such as the rollers through which it passes to eliminate the water therefrom, must be regarded as "stock-treating parts" within the provisions of said paragraph 356. We might further add that, under appellant's theory, every manufacturing process for the production of paper from the time the stock leaves the head box to the point where the product takes the form and name of paper, must be considered as a "stock-treating" process. We agree with the lower court that, from the time the stock leaves the head box, the process of manufacturing paper from the stock begins. The stock, when it reaches the head box, is ready to be made either into pulp board or paper, and, as stated by the lower court, the elimination therefrom of water, while upon the screens, is merely the first step in its manufacture into the new product.

Appellant contends that the words "stock-treating parts" are plain and unambiguous, and that therefore there is no occasion to interpret them or inquire into the legislative intent in the use of those words. It relies upon the dictionary definitions of the word "treat" in support of this contention.

Webster's New International Dictionary defines the word "treat" as follows:

1. To deal with or handle;  *  *  *.
2. To subject to some action, as of a chemical reagent; as to *treat* a substance with sulphuric acid; more loosely, to subject to some process with a special end in view; to manipulate; as, to *treat* rugs, wines, ores.

We do not think that the legislative intent in the use of the words "stock-treating parts for pulp and paper machinery" is so apparent as to exclude consideration of the doctrine of *ejusdem generis* or other applicable rules of construction.

We agree with the lower court that the screens here involved are not *ejusdem generis* with the articles designated in said paragraph 356. The articles named in the paragraph are those which cut, grind, or beat material, or assist in performing those functions. It is estab-

lished that the screens here involved neither perform nor assist in performing such functions.

If appellant be correct in its contention that the broadest possible definition of the word "treat" be here applied, then all processes of paper making short of the actual production of paper are stock-treating processes. Appellant's witness testified that the second squeezing out of water from the material, which takes place after it. has left the screens here involved, results in the formation of paper. That is to say, after sufficient water has been squeezed out of the material, the resulting product is paper. We are convinced that Congress never intended that all manufacturing processes in the production of paper, short of the actual formation of paper, should be regarded as stock-treating processes.

We are satisfied that it was not the intent of Congress to include such parts of paper-making machines as those here involved within the provisions of said paragraph 356.

This conclusion is strengthened by an examination of the legislative history of said paragraph. This is a new paragraph, not found in previous tariff acts. It was inserted in the tariff bill, H. R. 7456, by the House of Representatives.

In the Summary of Tariff Information, 1921, prepared and published after the bill had passed the House and while the bill was pending in the Senate, we find, after quoting the paragraph as it now reads, the following:

POWER, OR HAND MACHINE KNIVES

*Description and uses.*—Planing-machine knives are used mainly on wood-working machines, and rarely for metalworking. Tannery and leather knives are employed to remove the flesh and hair from leather skins, and to split leather. These knives are known as fleshing, shaving, whitening blades, and bark knives. Paper and pulp mill knives are made of a straight piece of steel and used on "roll" or "fly" bars or beater engines, and on chippers and cutters. Slitter knives are of circular form and used in paper machines for slitting, or cutting, the paper lengthwise. A roll bar is a metal cylinder about 4 or 5 feet in diameter with heavy knives parallel with the shaft fitted into its face. A bedplate is a series of steel plates standing on edge and bolted together. The *"stock," or rough paper material*, passes between the revolving "roll bar" and the stationary "bedplate" to be cut up. The names of the other kinds of knives mentioned in the paragraph indicate the kinds and their uses. (Italics ours.)

As heretofore indicated, we think that the words "stock-treating parts," as used in said paragraph 356, refer to the treatment of paper and pulp material before it has reached the stage of going upon the wire screens here involved, and refer to parts which perform, or assist in performing, the functions of cutting, grinding, beating, or similar functions. Inasmuch as we conclude that the wire screens involved do not perform such functions, but serve in the process of manufacturing paper from stock they can not be held to be "stock-treating"

parts for pulp and paper machinery," and were properly held dutiable by the collector under the provisions of said paragraph 372.

In appellant's brief the following statement is found:

The evidence below clearly and definitely establishes the meaning of the term "stock" and "stock-treating," and in the absence of any contradictory evidence must be accepted by the court.

Appellant is in error in this statement. While evidence of the common meaning of the terms "stock" and "stock-treating," as used in the statute, was admissible as aiding the memory and understanding of the court, it is not conclusive and the court may disregard such evidence. *United States* v. *Felsenthal & Co.*, 16 Ct. Cust. Appls. 15, T. D. 42713.

The judgment of the United States Customs Court is *affirmed*.